UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-60695-CIV-ALTMAN

**KELLY DAWN VERBAL**,
*individually and on behalf of others similarly situated*,

    *Plaintiffs*,

v.

**TIVA HEALTHCARE, INC.**, *et al.*,

    *Defendants*.
_____/

## ORDER

Kelly Dawn Verbal worked as a Certified Registered Nurse Anesthetist ("CRNA") for Envision Physician Services—one of three related corporations that provided clinicians for healthcare systems throughout the country. Her employment contract required Envision to give her notice before cancelling her work assignments. But, in March 2020—just as the COVID-19 pandemic was pushing the nation into quarantine—Envision unilaterally cancelled Verbal's work assignment *without* prior notice and informed her that she wouldn't be receiving the hourly compensation (she thought) she was promised. So, Verbal sued Envision and its two related corporations—TIVA Healthcare and Sheridan Healthcare—for violating her employment contract by failing to provide her with the notice (she says) she was due (Count I). *See* Amended Complaint [ECF No. 27]. She's also brought a promissory-estoppel claim (Count II). *Ibid.* The Defendants answered and asserted several affirmative defenses, including—as relevant here—an impossibility and a frustration-of-purpose defense. *See* Answer [ECF No. 30] at 6.

As it turns out, Verbal wasn't alone. Some 61 other CRNAs have had their assignments similarly cancelled—all (allegedly) without the notice their contracts with the Defendants required. In

a previous order, we certified the Plaintiffs' Class and allowed Verbal to serve as Class rep. *See* Order Granting the Plaintiff's Motion for Class Certification [ECF No. 61] (the "Class Certification Order). That Class now consists of:

> All Certified Registered Nurse Anesthetists who contracted with Defendants, nationwide, and who: (1) were contractually guaranteed a certain number of weekly hours, weekly shifts of a specified duration, or certain specific dates of shifts for a particular number of hours on each date; (2) had contracts containing a written notice period before either party could cancel; and (3) had their contracts and/or assignments cancelled or terminated between March and June 2020, without the contractual notice period elapsing between written notice and cancellation/termination.

*Id.* at 17.

After some protracted litigation, both sides filed motions for summary judgment, which we resolve here. *See* Defendants' Motion for Summary Judgment [ECF No. 68] (the "Defendants' MSJ"); the Plaintiff's Motion for Summary Judgment [ECF No. 70] ("Verbal's MSJ").[1] In her MSJ, Verbal seeks only "a determination as to liability that [the] Defendants breached the agreements with their CRNAs." Verbal's MSJ at 2 n.3. "The damages sought," Verbal continues, "will be subsequently determined at trial, or between the Parties themselves once liability is established." *Ibid.* Verbal has thus moved for partial summary judgment only on (1) her breach-of-contract claim (Count I) and (2) the affirmative defenses of "impossibility" and "frustration of purpose." She hasn't, in other words, sought summary judgment on her promissory-estoppel claim or on the rest of the Defendants' affirmative defenses.

The Defendants, meanwhile, have asked for summary judgment on *both* of Verbal's claims. *See generally* Defendants' MSJ. With respect to Count I (the breach-of-contract claim), they offer three

---

[1] Both motions are fully briefed and ripe for adjudication. *See* Plaintiff's Opposition to Defendants' Motion for Summary Judgment [ECF No. 76] ("Verbal's Response"); Defendants' Reply in Support of their Motion for Summary Judgment [ECF No. 77] (the "Defendants' Reply"); Defendants' Response in Opposition to Plaintiff's Motion for Summary Judgment [ECF No. 74] (the "Defendants' Response"); Plaintiff's Reply in Support of Plaintiff's Motion for Summary Judgment [ECF No. 80] ("Verbal's Reply").

2

reasons for their view that Verbal "cannot satisfy the essential elements of her breach of contract claim against any of the Defendants." *Id.* at 5. *First*, they say that (at the very least) Sheridan can't be liable because "it's not a party to any contract." *Ibid.* (cleaned up). *Second*, they insist that their contracts with Verbal don't "require [the] Defendants to pay Verbal guaranteed compensation during [what would've been] the notice period[.]" *Id.* at 6. *Third*, they contend that "Verbal's claims are barred by the doctrines of impossibility and frustration of purpose." *Id.* at 12 (cleaned up). Attacking Count II, the Defendants argue that Verbal cannot sustain a promissory-estoppel claim because "written contracts cover the disputed promise." *Id.* at 18 (cleaned up). And (they add) Sheridan cannot be liable under a theory of promissory estoppel for the additional reason that it never "made any affirmative representations concerning notice or purported guaranteed compensation concerning her employment." *Id.* at 19.

After careful review, we now **GRANT IN PART** and **DENY IN PART** the Defendants' MSJ and **DENY** Verbal's.

## ANALYSIS

### I.    We grant the Defendants' MSJ as to Sheridan[2]

We start with the obvious: Sheridan shouldn't be a party to this breach-of-contract case because it isn't a party to *any* of our contracts. "It goes without saying that a contract cannot bind a nonparty." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002); *see also Miles v. Naval Aviation Museum Found., Inc.*, 289 F.3d 715, 720 (11th Cir. 2002) (applying Florida law and explaining that "[a] third-party cannot be bound by a contract to which it was not a party"); *Future Tech Int'l., Inc. v. Tae Il Media, Ltd.*, 944 F. Supp. 1538, 1564 (S.D. Fla. 1996) (Marcus, J.) ("It is axiomatic that maintenance of a

---

[2] The parties agree that Florida law applies to Verbal's breach-of-contract claim. *See* Defendants' MSJ at 5 ("Because federal courts sitting in diversity generally apply state law to questions of contract, Florida law applies to Verbal's breach of contract claim." (citing *Nature's Prod., Inc., v. Natrol, Inc.*, 990 F. Supp. 2d 1307, 1313–14 (S.D. Fla. 2013) (Dimitrouleas, J.)); *see also* Verbal's MSJ at 5 (citing Florida law in discussing Verbal's breach-of-contract claim).

3

contract action requires that the defendant be a party to the contract at issue.").

It's undisputed that Sheridan isn't a party to Verbal's contracts. She entered into the Provider Agreement with TIVA. *See* Amended Complaint at 12–14 (the "Provider Agreement") § 1 ("This Provider Agreement . . . is dated and is between TIVA HealthCare, Inc. ('TIVA') and ('You or Yours')[.]"); *see also* Joint Statement of Material Facts [ECF No. 66] ("JSOMF") ¶ 10 ("On June 2, 2016, TIVA and [Verbal] executed a Provider Agreement pursuant to which Verbal agreed to provide medical services as a CRNA[.]"). And she entered into the Confirmation Letter with Envision. *See* Amended Complaint at 15 ("Verbal's Confirmation Letter") ("This confirmation letter . . . is issued pursuant to the Clinician Services Agreement in effect between Envision Physician Services (ENVOY) and the clinician party listed below [Verbal]."); *see also* JSOMF ¶ 18 ("On January 16, 2020, Envision and Verbal executed a Clinician Confirmation Letter pursuant to which Verbal agreed to provide medical services for Envision as a CRNA at [ANES Orlando] from January 27, 2020 through June 27, 2020[.]"). As the Defendants point out, the law recognizes that it wouldn't make sense to hold Sheridan liable for promises it never agreed to keep. *See Norfolk S. Ry. Co. v. Groves*, 586 F.3d 1273, 1281 (11th Cir. 2009) ("[I]t is a fundamental principle of contracts that[,] in order for a contract to be binding and enforceable, there must be a meeting of the minds on all essential terms and obligations of the contract." (cleaned up)).

Still resisting, Verbal says that Sheridan "should not be dismissed from the case" based on "the significant testimony and evidence that Sheridan Healthcare is synonymous with Defendant Envision[.]" Verbal's Response at 19 (cleaned up). In other words, because some Envision employees continued to use their Sheridan email addresses—and because Sheridan "maintained a tax ID and some provider contracts," *ibid.*—Verbal contends that "it would be improper to dismiss Sheridan from the case because only Envision's name appears on the documents and Sheridan is not separately referenced," *id.* at 19–20. But Verbal doesn't cite any law for this proposition—which is reason enough

4

to reject it out of hand. *See Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it."). Nor could she have: As we've said, no aspect of Sheridan's (or Envision's) corporate structure "overcomes the well-established principle in Florida that a breach of contract claim may only be maintained against a party to the contract." *Marlite, Inc. v. Eckenrod*, 2012 WL 3620024, at *10 (S.D. Fla. July 13, 2012) (Torres, Mag. J.), *report and recommendation adopted*, 2012 WL 3614212, at *3 (S.D. Fla. Aug. 21, 2012) (Moreno, J.); *see also Runton v. Brookdale Senior Living, Inc.*, 2018 WL 1057436, at * 6 (S.D. Fla. Feb. 2, 2018) (Altonaga, J.) ("Defendant correctly states the unremarkable proposition that in Florida a breach of contract claim may only be maintained against a party to the agreement." (cleaned up)).

For what it's worth, the facts belie Verbal's claim that Sheridan is "synonymous" with Envision. Verbal's Response at 19. Verbal, in fact, has *stipulated* that Envision is the "successor" entity to Sheridan. JSOMF ¶ 3. In other words, Verbal has conceded that Envision *replaced* Sheridan. *See Whetstone Candy Co., Inc. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1075 (11th Cir. 2003) ("A 'successor' is 'one that follows,' especially 'one who succeeds to a throne, title, or estate or is elected or appointed to an office, dignity, or other position *vacated by another*.'" (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 2282 (1976) (emphasis added))). And Envision's own employees testified that this is exactly what happened. *See* Deposition of Andrew Jay Greenfield [ECF No. 66-3] ("Greenfield Dep.") at 10:23 (explaining that, after the merger with Sheridan, the Defendants (including the entity formerly known as Sheridan) "called [themselves] Envision"); Deposition of Laurie Ann Dimarzio [ECF No. 66-2] ("Dimarzio Dep.") 19:17–18 ("And because Sheridan, you know, that brand name was . . . a legacy name [that] was going away[.]").

Even if Verbal hadn't conceded that Envision replaced Sheridan, we'd still disagree with her that the two entities are interchangeable. The facts Verbal relies on (the Sheridan email addresses and

5

the Sheridan tax I.D.) suggest that—to the extent Sheridan continues to exist—it does so only as a *subsidiary* of Envision. *See* Deposition of Mansoor Khan [ECF No. 66-4] ("Khan Dep.") at 15:14–17 ("All the three companies [Envision, TIVA, and Sheridan] are separate or, you know, they are – some of the operations are still separate. *I guess they all roll up to Envision*." (emphasis added)); *see also* Dimarzio Dep. at 18:10–18 ("Q: Who is Sheridan? A: Sheridan is *part of* the [Envision] staffing entities. Q: How did they relate to TIVA, if at all? A: TIVA was a supplier for contingent labor to any of Envision Physician Services' needs, which could include Sheridan. I believe Sheridan is another entity that was a part of an integration effort to, you know, be *fused under* just Envision Physician Services." (emphasis added)). And, if that's true, then Sheridan is a separate legal entity that cannot be liable for Envision's contractual obligations. *Cf. Whetstone*, 351 F.3d at 1074 ("Corporations are separate legal entities[,] and contracts made by a parent corporation do not bind a subsidiary merely because one corporation owns all of the stock of the other corporation."); *St. Petersburg Sheraton Corp. v. Stuart*, 242 So. 2d 185, 190 (Fla. 2d DCA 1970) ("Ownership by one corporation of all the stock of another corporation does not destroy the identity of the latter as a distinct legal entity; nor does the fact that stockholders or officers in two corporations are the same persons operate to destroy the legal identity of either corporation.").

In short, because Sheridan isn't a party to any of the relevant contracts, we **GRANT** Sheridan's MSJ as to Count I of the Amended Complaint.[3]

---

[3] Two more things on this. *First*, we disregard Verbal's plea to keep Sheridan in the case out of concern that TIVA and Envision won't be able to satisfy a judgment. *See* Verbal's Response at 20. We don't force defendants who aren't (and can never be) liable to the plaintiff to stay in the case (period)—and we certainly don't do so on the offhand supposition that (maybe) the defendants who *might* be liable won't be able to pay a judgment the plaintiff hasn't yet secured. *Second*, we reject Verbal's request to amend its already-amended complaint this late in the game, because the parties have been litigating this case for well over two years. To start over now—with a new complaint, a new answer, more discovery on a new (and unrelated) "claim for tortious interference," Verbal's Response at 20, more class-certification briefing on the new claim, and then renewed summary-judgment practice—would severely prejudice the Defendants, who have spent lots of time and money on this case already (and who deserve their day in court), would backlog the Court by further delaying trial, and wouldn't

### II. We deny Verbal's MSJ as to Count I

When we view the evidence in the light most favorable to the Defendants,[4] Verbal hasn't shown—as Florida law requires—that the Defendants' breach was *material*.

"For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a *material* breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (emphasis added) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008)); *see also Abbot Labs., Inc. v. Gen. Elec. Capital*, 765 So. 2d 737, 740 (Fla. 5th DCA 2000) ("The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages." (cleaned up)). "To constitute a vital or material breach, a defendant's non-performance must be such as to go to the essence of the contract." *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1313 (11th Cir. 2019) (quoting *Sublime, Inc. v. Boardman's Inc.*, 849 So. 2d 470, 471 (Fla. 4th DCA 2003)). "[T]he party alleged to have breached the contract must have failed to perform a duty that . . . is of such significance that it relieves the injured party from further performance of its contractual duties." *Burlington & Rockenbach, P.A. v. Law Offices of E. Clay Parker*, 160 So. 2d 955, 960 (Fla. 5th DCA 2015) (cleaned up). "A party's failure to perform some minor part of [its] contractual duty cannot be classified as a material or vital breach." *Covelli Family, L.P. v. ABG5, L.L.C.*, 977 So. 2d 749, 752 (Fla. 4th DCA 2008).

As we'll explain in a moment, Verbal may well meet this materiality test at trial. The problem is she never contends in her briefing that the Defendants *materially* breached *either* the Provider

---

necessarily bring Verbal any added relief, *see* Defendants' Reply at 9 n.4 ("Verbal fails to point to *any* evidence that would substantiate a tortious interference claim."). Plus, Verbal has failed to explain why she couldn't have brought her tortious-interference claim back before discovery was closed. Verbal, in sum, has failed to establish "good cause" under Rule 16 and "excusable neglect" under Rule 15 to bring her belated claim now.

[4] *Cf. Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001) ("On a motion for summary judgment, we review the facts and all reasonable inferences in the light most favorable to the non-moving party." (cleaned up)).

Agreement *or* her Confirmation Letter. *See* Verbal's MSJ at 5 ("[I]t also cannot be disputed that Defendants breached the agreements they had with Plaintiff and the CRNAs, as Defendants *admit* they did not give proper notice of cancellation under the agreements."); *id.* at 7 ("Thus, Defendants cannot dispute, based on their own corporate representatives' testimony and facts here, that they breached the notice provisions of Plaintiffs' agreements by failing to give the requisite written notice."); *id.* at 9 ("Thus, summary judgment is warranted here[,] and this Court should find that Defendants breached the agreements they had with Plaintiff and the CRNAs, and that Plaintiff and the CRNAs were damaged by Defendants' breach.").[5] She, in fact, ignores materiality entirely. *Cf. United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances[.]"); *see also In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed [forfeited]." (cleaned up)). Because of this costly omission, we **DENY** Verbal's MSJ as to Count I.

### III.   We deny TIVA and Envision's MSJ as to Count I

When the evidence is viewed in her favor, Verbal's contract claim (Count I) survives.

#### A.   There's evidence that the Contracting Defendants breached the contracts and damaged Verbal

When viewed in the light most favorable to Verbal, the evidence suggests (1) that the Contracting Defendants materially breached Verbal's Provider Agreement (and Confirmation Letter) and (2) that this breach harmed Verbal.

We'll start with the breach: The Contracting Defendants failed to give Verbal and the Class proper notice under the contracts. "Breach, as applied to contracts, is a failure, without legal excuse,

---

[5] Nor does she touch on materiality in her Reply. *See* Verbal's Reply at 5 ("Defendants did not have to breach their contracts. They chose to do so.").

*to perform any promise that forms a whole or a part of a contract*, including the refusal of a party to recognize the existence of the contract or the doing of something inconsistent with its existence." BREACH AS CAUSE OF ACTION, GENERALLY, 11 Fla. Jur. 2d Contracts § 267 (June 2022 Update) (emphasis added); *see also Clower v. Orthalliance, Inc.*, 337 F. Supp. 2d 1322, 1333 (N.D. Ga. 2004) ("Whenever a party to a contract fails to perform his duties, without a valid excuse, he is liable for breach of contract." (cleaned up)).

Both of Verbal's contracts—her Provider Agreement and her Confirmation Letter—required the Contracting Defendants to notify her *at least* thirty days before any no-cause termination. *See* Provider Agreement § 7 ("Additionally, either TIVA or You may, at its option, terminate any executed Schedule A entered into pursuant to this Agreement without cause, upon thirty (30) days prior written notice without terminating this agreement."); Verbal's Confirmation Letter ("Any party may terminate such agreement upon thirty (30) days written notice to the other parties."). And, on this, the Defendants (rightly) agree. *See* JSOMF ¶¶ 14–15 (stipulating that *both* the Provider Agreement *and* Verbal's Confirmation Letter can be terminated, without cause, only with thirty days' prior written notice). The other Class Members were entitled to prior written notice, too. *See, e.g.*, Exhibit "A" to the Defendants' Response to Motion for Class Certification [ECF No. 38-1] (the "Other Clinician Confirmation Letters") at 2 (including a Clinician Confirmation Letter that says: "Any party may terminate such agreement upon seven (7) days by text, email, telephone, or written notice to the other parties"); *id.* at 3 (including another Clinician Confirmation Letter with a "forty-eight (48) hour" notice period).

And the Defendants *admit* that they cancelled all of the Class Members' assignments—including Verbal's—without providing *any* prior written notice. *See* JSOMF ¶ 31 ("Because there were not enough patients to be treated, Envision chose to immediately cancel Verbal's and the other class members' scheduled shifts without notice."); *id.* ¶ 42 ("On March 30, 2020, Envision sent Verbal a

9

letter advising her that her Confirmation Letter and assignment at ANES Orlando was cancelled as of March 23, 2020. This was the first written notice Verbal received that her assignment at ANES Orlando had actually been cancelled." (cleaned up)). That's a breach—plain and simple. And it's a *material* breach because it "goes to the essence of the contract and is of such significance that it relieves the injured party from a further performance of its contractual duties." *Hall v. Sargeant*, 2020 WL 1536435, at *7 (S.D. Fla. Mar. 30, 2020) (Altman, J.) (quoting *Burlington*, 160 So. 3d at 960). The essence of Verbal's Confirmation Letter (obviously) was that she'd be assigned to work. And it's hard to disagree with the proposition that Envision's breach "relieved" Verbal of "further performance of [her] contractual duties[.]" Again, viewing the evidence in the light most favorable to Verbal, we think that's enough to get her past summary judgment on the question of materiality.

There's also evidence that te breach caused Verbal some harm. Under Florida law, "once liability is established, an injured person is entitled *as a matter of right* to compensatory damages." *St. Regis Paper Co. v. Watson*, 428 So. 2d 243, 247 (Fla. 1983) (emphasis added) (citing *Fisher v. City of Miami*, 172 So. 2d 455 (Fla. 1965)); *see also MSM Golf, L.L.C. v. Newgent*, 853 So. 2d 1086, 1087 (Fla. 5th DCA 2003) ("It is a fundamental principle of contract law that once liability for a contract breach is established, an injured party is entitled as a matter of right to compensatory damages." (cleaned up)). This makes sense: "Compensatory damages, as the words indicate, are awarded to compensate an injured person for the acts of the wrongdoer[.]" *Watson*, 428 So. 2d at 247; *see also Farman v. Deutsche Bank Nat'l Tr. Co. as Tr. for Long Beach Mortg. Loan Tr. 2006-05*, 311 So. 3d 191, 195 (Fla. 2d DCA 2020) ("On a claim for breach of contract, the purpose of a damages award is to restore an injured party to the same position that he would have been in had the other party not breached the contract." (cleaned up)). But the plaintiff must show that her damages "result from the breach." *Vega*, 564 F.3d at 1272 (cleaned up).

In other words, since the Contracting Defendants breached the Class Members' contracts

*without* prior notice, the Class Members are "entitled *as a matter of right* to compensatory damages," *Watson*, 428 So. 2d at 247 (emphasis added), so long as those damages "result from the breach," *Vega*, 564 F.3d at 1272 (cleaned up). The evidence supports Verbal's view that she was, for some time, working regular, forty-hour weeks while earning the "Pay Rate" outlined in her Confirmation Letter. *See* Exhibit A to the Declaration of Bradford Lacy [ECF No. 77-1] (the "Payroll Records"). And the record indicates that Verbal was slated to work 160 hours per month (at that same "Pay Rate") until June 2020. *See* Exhibit 1 to Verbal's SOMF [ECF No. 69-1] (the "Defendants' Locum Schedule"). Viewing this evidence in the light most favorable to Verbal, we think a reasonable fact-finder *could* conclude that the Defendants' breach caused Verbal to lose a not-insignificant amount of income over the thirty-day notice period.

### B. The Defendants' Affirmative Defenses

Nor do the Defendants' Affirmative Defenses—of impossibility and frustration of purpose—preclude Verbal from proceeding to trial. Here's how the Defendants pled those defenses in their Answer:

> **THIRD AFFIRMATIVE DEFENSE**
>
> To the extent Defendants had a contract with Plaintiff or putative class members, the purpose of the contract was frustrated by the global health pandemic and associated economv [sic] impact and government actions.
>
> **FOURTH AFFIRMATIVE DEFENSE**
>
> To the extent any performance required by Defendants, plaintiff, and/or the putative class members was made impossible and/or impractical by the global health pandemic and associated economic impact and government actions, any breach of contract and promissory estoppel claims are barred.

Answer at 6 (cleaned up).

Both defenses are "well-recognized defenses to non-performance of a contract." *Mailloux v. Briella Townhomes, LLC*, 3 So. 3d 394, 396 (Fla. 4th DCA 2009) (collecting cases). And, while these two defenses are similar, they *are* different:

11

> Impossibility of performance refers to the nature of the thing to be done, and not to the ability of the party to perform what the party has agreed to do. Impossibility of performance concerns those factual situations where the purposes for which the contract was made have, on one side, become impossible to perform. In contrast, frustration of purpose arises when one of the parties finds that the purposes for which he or she bargained, and which purposes were known to the other party, have been frustrated because of the failure of consideration or impossibility of performance by the other party.

*In re Cinemex USA Real Estate Holdings, Inc.*, 627 B.R. 693, 697 (Bankr. S.D. Fla. 2021) (Isicoff, J.).

We'll start with impossibility. As our Circuit has said, the Florida defense of impossibility is about "change." *Cook v. Deltona Corp.*, 753 F.2d 1552, 1558 (11th Cir. 1985). "[I]t arises as a defense when the real world has in some way failed to correspond with the imaginary world hypothesized by the parties to the contract." *Ibid.* "By recognizing impossibility as a sort of 'escape hatch' from the self-made chamber of contractual duty, the courts have recognized that absolute contractual liability is economically and socially unworkable . . . . [thereby accommodating] the tension between the changes a party bargains to avoid and the changes, unbargained for and radical, that make enforcement of the bargain unwise." *Ibid.* The *Cook* Court explained that "the most profitable approach to an impossibility claim is not to pass on the relative difficulty caused by a supervening event, but to ask whether that supervening event so radically altered the world in which the parties were expected to fulfill their promises that it is unwise to hold them to the bargain." *Ibid.* "Ultimately, the issue is whether the change was foreseeable." *Ibid.* (holding that—because a substantial increase in "the regulation of dredge and fill activities on Marco Island" was "not beyond the contemplation" of a land developer who'd breached a purchase-and-sale contract for a residence on that island—the land developer's impossibility defense couldn't overturn a directed verdict for the purchaser on a breach-of-contract claim).

But impossibility of performance "refers to the nature of [the] thing to be done—not the ability of the party to perform what he has agreed to do." *Lewis v. Belknap*, 96 So. 2d 212, 213–14 (Fla. 1957). And, "[a]lthough impossibility of performance can include extreme impracticability of

12

performance, courts are reluctant to excuse performance that is not impossible but merely inconvenient, profitless, and expensive[.]" *Valencia Ctr., Inc. v. Publix Super Markets, Inc.*, 464 So. 2d 1267, 1269 (Fla. 3d DCA 1985); *see also Fla. Dep't. of Fin. Servs. v. Freeman*, 921 So. 2d 598, 608 (Fla. 2006) (Cantero, J., concurring) ("Nor does the doctrine 'excuse performance that is not impossible but merely inconvenient, profitless, and expensive.'" (quoting *Valencia*, 464 So. 2d at 1269)). Put differently, "[i]nconvenience or the cost of compliance, though they might make compliance a hardship, cannot excuse a party from the performance of an absolute and unqualified undertaking to do a thing that is possible and lawful." *City of Tampa v. City of Port Tampa*, 127 So. 2d 119, 120 (Fla. 2d DCA 1961).[6]

Our Defendants tether their impossibility defense to the COVID-19 pandemic—specifically, to an Executive Order (issued by Governor Ron DeSantis) that, in essence, prohibited "medically-unnecessary" surgeries. *See* Defendants' MSJ at 12 ("Defendants assert that Verbal's claims are barred

---

[6] The Supreme Court of the United States has emphasized this principle too. *See The Harriman*, 76 U.S. 161 (1869). In that case, a freighter contracted with a shipowner to have the latter's captain sail his ship (the "Harriman") to Valparaíso, Chile (then a Spanish colony), for the purpose of freighting steam coal to the Spanish fleet in its war against its colonies. *See id.* at 167–68. The parties agreed that the captain—once he arrived in Valparaíso—would consign the cargo to the commanding officer of the Spanish navy. *See ibid.* But they never provided for the possibility that the Spanish fleet might not be found. *See id.* at 169–70. And, sure enough, when the captain arrived in the Chincha Islands (some 1200 miles north of Valparaíso), he learned *both* that the Spanish fleet had left Valparaíso *and* that its current destination was unknown. *See ibid.* So, the shipowner hailed the captain back to San Francisco, sold the freighter's cargo, and refused to return the freighter's deposit. *See ibid.* The Court ruled unequivocally for the freighter, reasoning that:

> [I]f what is agreed to be done is possible and lawful, it must be done. Difficulty or improbability of accomplishing the undertaking will not avail the defendant. It must be shown that the thing cannot by any means be effected. Nothing short of this will excuse non-performance. The answer to the objection of hardship in all such cases is that it might have been guarded against by a proper stipulation. It is the province of courts to enforce contracts—not to make or modify them. When there is neither fraud, accident, nor mistake, the exercise of dispensing power is not a judicial function.

*Id.* at 172–73.

13

because the COVID-19 global health pandemic and associated government actions . . . rendered any performance required by Defendants and Verbal under the Provider Agreement and Confirmation letter impossible."). They concede, however, that the Executive Order didn't cancel *every* surgery in the hospitals where Verbal (and the other Class Members) worked. Instead, only "70%–85% of the surgeries that [were] scheduled were canceled[.]" JSOMF ¶ 30.

That crucial fact cuts both ways. On the one hand, the Defendants have thus admitted that—as unforeseeable as the COVID 19-pandemic was—they *might've* been able to schedule Verbal for *some* of her shifts during the notice period. And, as Florida law makes plain, "inconvenience or the cost of compliance . . . cannot excuse a party from the performance of an absolutely and unqualified undertaking to do a thing that is possible and lawful." *City of Tampa*, 127 So. 2d at 120 (cleaned up). On the other hand, we think it goes without saying that the pandemic rendered the Defendants' performance—to what extent we're not sure—impracticable. *See, e.g.*, Greenfield Dep. at 54:2–9 ("Okay. If you do the math, Ryan, and you consider the rate of decrease, we could have had half the full-time people in some places and still had plenty of people. The shifts just didn't exist. The elective surgery just disappeared, and facilities closed, locked the doors. You couldn't go in to work. There was no work to be done.").

The question, then, is whether the Defendants' performance was so "extremely impracticable," *Valencia*, 464 So. 2d at 1269, that the impossibility defense would absolve them of liability for having breached the Class Members' contracts. And that's a question of fact we'll have to answer at trial—after having had a full opportunity to consider and weigh the evidence. *Cf. Walter T. Embry, Inc. v. LaSalle Nat'l Bank*, 792 So. 3d 567, 570 (Fla. 4th DCA 2001) (whether the "doctrine of impossibility" applied to bar a mortgage-foreclosure action was "one of fact, which should not have been decided on the basis of a summary judgment [motion]"); *Genuinely Loving Childcare, LLC v. Bre Mariner Conway Crossings, LLC*, 209 So. 3d 622, 626 (Fla. 5th DCA 2017) (reversing an order granting

14

summary judgment on the affirmative defense of impossibility in a landlord-tenant action where "there remain[ed] a genuine issue of material fact as to whether it was foreseeable at the inception of the lease that the department would deny Tenant the urban designation and require outdoor play space for licensure").

We therefore **DENY** both MSJs as to the Defendants' Fourth Affirmative Defense (impossibility of performance).

***

We come out the same way on frustration of purpose. "The defense of frustration of purpose refers to the condition surrounding contracting parties where one of the parties finds that the purposes for which it bargained, and which purposes were known to the other contracting party, have been frustrated to the extent that the breaching party is not receiving the benefit of the bargain for which they contracted." *In re Maxko Petroleum, LLC*, 425 B.R. 852, 872 (Bankr. S.D. Fla. 2010) (Olson, J.) (citing *Home Design Ctr.–Joint Venture v. Cnty. Appliances of Naples, Inc.*, 563 So. 2d 767, 770 (Fla. 2d DCA 1990)). "The doctrine of commercial frustration is [thus] limited to cases where performance is possible but an alleged frustration, which was not foreseeable, *totally or nearly totally destroyed* the purpose of the agreement." *Valencia*, 464 So. 2d at 1269 (emphasis added).

That's really what the Defendants are getting at here. The parties agree, after all, that CRNAs "are not assigned when full-time employees are able to cover all available work." JSOMF ¶ 8. The contracts' "purpose," then, from the perspective of the Contracting Defendants, is to cover the shifts their full-time employees cannot service. Verbal, for her part, testified that the Defendants wouldn't hire her unless they had some need the full-time employees couldn't satisfy. *See* Deposition of Kelly Verbal [ECF No. 66-5] ("Verbal Dep.") at 27:17–24 ("Q: Well, in your experience generally as an independent contractor and . . . locum tenens worker, is it your understanding that you are asked to perform services when there's a need because the provider does not have enough employees to do

the amount of work that they need done? A: Yes. Otherwise, they would not hire locum tenens."). Verbal understood, in sum, that she'd be scheduled *only* to fulfill the Defendants' surplus surgery needs.

The question that remains for trial, therefore, is whether the Contracting Defendants' purpose was "totally or nearly totally destroyed." *Valencia*, 464 So. 2d at 1269. As we've said, the parties admit that, even after the Executive Order, the Defendants retained up to 30% of their surgery work. *See* JSOMF ¶ 30. So, while it may not have been *impossible* (or even extremely impracticable) for the Defendants to include the Class Members in their post-COVID-19 surgery schedules, we leave for another day an assessment of the extent to which COVID-19 interfered with the Defendants' volume. We thus **DENY** both MSJs as to the Defendants' Third Affirmative Defense (frustration of purpose).

### IV.    The Defendants are entitled to summary judgment on Count II

Verbal's promissory-estoppel claim (Count II) fails. Under Florida law, "[t]he doctrine of promissory estoppel comes into play where *the requisites of contract are not met*, yet the promise should be enforced to avoid injustice." *Doe v. Univision Television Grp., Inc.*, 717 So. 2d 63, 65 (Fla. 3d DCA 1998) (emphasis added). "Promissory estoppel is not available as a remedy when parties have a written contract addressing the relevant issues[.]" *Univ. of Miami v. Intuitive Surgical, Inc.*, 166 F. App'x 450, 454 (11th Cir. 2006) (citing *Advanced Mktg. Sys. Corp. v. ZK Yacht Sales*, 830 So. 2d 924, 928 (Fla. 4th DCA 2002)).

But "the requisites of contract" *have been* "met" here. In her Response, Verbal stipulates that, "if all Defendants admit that they entered into enforceable contracts with Plaintiff and the Class, then Plaintiff agrees that this claim need not proceed as to those Defendants." Verbal's Response at 19 n.8. And the Defendants did just that. *See* Defendants' Response at 3 "The [Contracting Defendants] do not dispute that . . . TIVA and Verbal executed the Provider Agreement [and that] Envision and Verbal executed the Clinician Confirmation Letter[.]"). We thus **GRANT** the Defendants' MSJ as to

16

Count II.[7]

\*\*\*

After careful review, we hereby **ORDER AND ADJUDGE** as follows:

1. The Defendants' MSJ [ECF No. 68] is **GRANTED in part** and **DENIED in part**. As to Count I of the Amended Complaint, we **GRANT** Sheridan's request for summary judgment. As to Count II of the Amended Complaint, we **GRANT** the Defendants' request for summary judgment. The Defendants' MSJ is **DENIED** in all other respects.

2. Verbal's MSJ [ECF No. 70] is **DENIED**.

**DONE AND ORDERED** in the Southern District of Florida, this 12th day of September 2022.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record

---

[7] Note that we would've granted the Defendants' MSJ as to this claim *even without* Verbal's agreement. Count II alleges that Verbal and the Class "suffered a loss of their guaranteed compensation during the required notice period." Amended Complaint ¶ 50. But the Provider Agreement and the Confirmation Letter "purport[ ] to address [those] broadly disputed issues." *White Holding Co., LLC, v. Martin Marietta Materials, Inc.*, 423 F. App'x 943, 948 (11th Cir. 2011) (cleaned up). And Verbal hasn't alleged—much less shown—that the Defendants made any *other* promises to her (*i.e.*, separate and apart from the written contracts). *See* Amended Complaint ¶ 47 ("Defendants reasonably expected to induce Plaintiff and the Putative Class, and did induce these individuals[,] to rely on Defendants' promises *contained within the Contracts*." (emphasis added)); *id.* ¶ 48 ("Plaintiff and the Putative Class reasonably relied on Defendants' *promises in the contracts*." (emphasis added)); *id.* ¶ 49 ("Defendants refused to honor their promises made to Plaintiff and the Putative Class by failing to give the required written notice *as dictated by the Contracts*." (emphasis added)). There's thus no *other* promise to support her promissory-estoppel claim. *See Coral Reef Drive Land Dev., LLC v. Duke Realty Ltd. P'ship*, 45 So. 3d 897, 902 (Fla. 3d DCA 2010) ("Promissory estoppel . . . is an equitable doctrine for the enforcement of agreements, not a device to nullify an expressly-agreed, written contractual term.").